# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-3031

———————

Laura Kincaid,                         *
                                        *

        Plaintiff-Appellant,        *

                                        *   Appeal from the United States

    v.                                  *   District Court for the District of

                                        *   Nebraska.

City of Omaha,                      *

                                        *

        Defendant-Appellee.      *

———————

Submitted: March 8, 2004
Filed: August 9, 2004

———————

Before RILEY, McMILLIAN, and MELLOY, Circuit Judges.

———————

MELLOY, Circuit Judge.

Laura Kincaid ("Kincaid") worked as a Detention Supervisor at the City of Omaha jail. In 2000, she suffered a job-related injury that prevented her from working. While on leave, Kincaid expressed interest in a promotion, which she did not receive. She later returned to work and sustained another injury. After the City of Omaha ("City") again denied her the promotion, Kincaid filed this lawsuit, alleging discrimination in violation of the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. The district court[1] found that

———————

[1]The Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska, to whom the case was referred for final disposition by consent

Kincaid made out a prima facie case of race and disability discrimination but failed to offer evidence to rebut the City's legitimate, nondiscriminatory reasons for its employment actions. The district court therefore granted summary judgment in favor of the City. We affirm.

I.    BACKGROUND

Kincaid, an African American, began working at the City jail in 1982 as a Detention Technician I. She was promoted to Detention Technician II in 1990 and to Detention Supervisor in 1996. In December 1999, Kincaid suffered a work-related injury to her shoulder and wrist. She informed the City of her injury and sought medical treatment from Dr. Gregory Hansen ("Dr. Hansen"), an orthopedic surgeon.

In January 2000, Dr. Hansen diagnosed Kincaid's injury as "a clear impingement syndrome with [a] possible rotator cuff tear." (App. at 24.) Dr. Hansen scheduled Kincaid for surgery and advised her not to do any work. After Kincaid's surgery on February 2, 2000, Dr. Hansen examined her once in February, twice in March, and once in April. On each occasion, he advised Kincaid not to do any work, not even sedentary tasks involving less than ten pounds of lifting.

On May 19, 2000, Susan Riley ("Riley"), a Workers' Compensation Coordinator for the City, wrote Dr. Hansen a letter inquiring about Kincaid's ability to return to work. Riley stated, "[W]e are able to provide sedentary desk duty in a controlled work environment in which Ms. Kincaid could sit, stand, or walk as needed, and we can accommodate almost any restriction that would be necessary." (App. at 40.) In response, Dr. Hansen advised the City that Kincaid was unable to do any work. Dr. Hansen reached the same conclusion after examining Kincaid on June

of the parties pursuant to 28 U.S.C. § 636(c).

-2-

2 and 13, 2000. Unable to work, Kincaid applied for leave under the Family and Medical Leave Act.

On June 29, 2000, while still out on leave and before she had received a work release from Dr. Hansen, Kincaid emailed Deputy Chief Barbara Hauptman ("Hauptman") to find out whether there were any jobs available at the jail that did not involve lifting, pulling, or potential confrontations with prisoners. Kincaid specifically inquired about the position of Detention Manager. Unlike the Detention Supervisor position, the Detention Manager position did not involve physical confrontations with prisoners. Instead of dealing directly with prisoners, the Detention Manager oversaw Detention Supervisors and Detention Technicians and was responsible for budgeting and personnel matters. Hauptman informed Kincaid that the current Detention Manager, Rick Powers ("Powers"), planned to resign soon.

Powers resigned on July 8, 2000. Thereafter, Kincaid again expressed an interest in the Detention Manager position to Hauptman. Despite Kincaid's interest, the City appointed Morgan Larson ("Larson") to temporarily fill the position. Larson had five years of experience as a Detention Supervisor at the City jail and previously worked as a lieutenant for the State Department of Corrections.

On July 12, 2000, a Benefits Manager for the City, Paul Murphy ("Murphy"), notified Kincaid that the City approved her June request for leave under the Family and Medical Leave Act. He also advised Kincaid that she must present a "fitness for duty certificate" before resuming employment with the City.

Kincaid did not receive a doctor's release to return to work until September 12, 2000. At that time, Dr. Hansen restricted Kincaid to light-duty, sedentary positions that did not involve a risk of physical confrontations with prisoners. Within two weeks of her return to work in September 2000, Kincaid sustained another shoulder injury for which surgery was required. She underwent surgery in October 2000 and

continued to receive treatment from Dr. Hansen thereafter. Kincaid never returned to work in the jail.

On January 17, 2001, Kincaid applied for a Service Connected Disability Pension. At her hearing before the pension board, Kincaid stated that Dr. Hansen had not yet released her to perform even limited-duty jobs. Approximately one week later, Kincaid obtained a letter from Dr. Hansen, in which Dr. Hansen stated that Kincaid was not to return to work in the jail due to the risk of physical confrontations and further injury. Shortly thereafter, the board granted Kincaid a disability pension.

Three days after Kincaid applied for her disability pension, the City hired retired police Lieutenant Charles Benak ("Benak") to replace Larson as the Detention Manager. Like Kincaid, Benak is disabled and receives a disability pension.

In March 2002, Kincaid filed the present lawsuit, claiming that the City failed to promote her to the Detention Manager position because of her disability or race, in violation of the ADA, 42 U.S.C § 1981, and Title VII. The City moved for summary judgment on all counts. It challenged whether Kincaid had a qualifying disability under the ADA, and it denied that its employment actions were motivated by any discriminatory animus.

The City offered several non-discriminatory reasons for its employment actions. Omaha Police Chief Donald Carey ("Carey") and Hauptman testified that the City jail was in the process of being merged with the county jail when the Detention Manager position first became available in July 2000. The City anticipated the merger to take two to four years, and after its completion, the City planned to eliminate the Detention Manager position. Due to the temporary nature of the position, Carey and Hauptman did not believe a full-scale employee search was warranted.

The City also maintained that Kincaid was not considered for the Detention Manager position in July 2000 or January 2001 because she had not presented a doctor's release when those positions were available. According to the City, standard operating procedures required an injured employee to present a doctor's release before returning to work. The City's Administrative Manual, which outlines the standard operating procedures at the jail, provides that "[e]mployees who have a doctor's release for light duty . . . may be assigned to a limited duty position within the department." (App. at 200.) The City further noted that Benefits Manager Murphy advised Kincaid that she must present a "fitness for duty certificate" prior to being restored to employment. Carey and Hauptman both testified that they did not consider Kincaid for the Detention Manager position because she failed to submit a doctor's release. Hauptman noted that at the time the City hired Benak, Kincaid was seeking a disability pension from the City and had represented that she was unable to do any work.

Finally, Carey testified that he selected Benak because Benak was well suited for the job. Carey believed that as a retired police lieutenant, Benak possessed a unique combination of experience, ability, and knowledge of police operations that would enable him to effectively manage the jail. Carey also thought Benak would facilitate the merger of the City and county jails.

Kincaid did not dispute that the City and county jails were undergoing a merger. Nevertheless, she maintained that the City's proffered legitimate reasons for hiring Larson and Benak were pretexts for unlawful discrimination. Kincaid claimed she was qualified for the Detention Manager position because she had previously performed that position on a temporary basis. Kincaid noted that Deputy Chief Brenda Smith testified that she (Kincaid) was a good employee, that Hauptman testified she should have been given an opportunity to interview for the Detention Manager position, and that some key decision-makers provided no reasons why she was not considered for the job. Kincaid further claimed that the decision to hire

Benak had nothing to do with whether Kincaid had presented the City with a doctor's release. According to Kincaid, Police Captain Anthony Infantino ("Infantino") announced the hiring of Benak in September 2000—after Kincaid had been released to work and before her second injury.

The district court found that Kincaid made out prima facie cases of disability and race discrimination, but held that she failed to show that the City's proffered legitimate reasons for its employment decisions were pretextual. It therefore granted summary judgment in favor of the City on each count. Kincaid then filed a motion for reconsideration, claiming that discovery conducted after the City filed its motion for summary judgment created a triable issue on the question of pretext. In her motion to reconsider, Kincaid moved to supplement the record with this additional evidence. The district court found that Kincaid's motion to supplement the record should be denied but nevertheless proceeded to analyze Kincaid's discrimination claims in light of the newly offered evidence. The district court denied Kincaid's motion to reconsider, again finding that Kincaid failed to rebut the City's legitimate reasons for not promoting her.[2]

## II.    APPLICABLE LAW AND DISCUSSION

### A.    Summary Judgment Standard

This Court reviews the district court's grant of summary judgment de novo. Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Summary

---

[2]We have considered the evidence Kincaid presented in the original motion for summary judgment as well as the additional evidence Kincaid presented in her motion to reconsider. Because we agree with the district court that this evidence combined is insufficient to survive summary judgment, we need not address the district court's alternative holding that Kincaid should not have been allowed to supplement the record.

judgment is appropriate if the record, viewed in a light most favorable to the non-moving party, contains no questions of material fact and demonstrates that the moving party is entitled to judgment as a matter of law.  Id.  The moving party bears the burden of showing both the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Fed. R. Civ. P. 56(c).  Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e).

B.    ADA

We analyze Kincaid's ADA discrimination claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1071 (8th Cir. 1998).  Under this framework, Kincaid must first establish a prima facie case of discrimination based upon a disability under the ADA.  See id.

> "To establish a prima facie case under the ADA, [Kincaid] 'must show that she is disabled within the meaning of the Act; [that] she is qualified to perform the essential functions of her job with or without reasonable accommodation; and [that] she suffered an adverse employment action because of her disability.'"

Id. at 1072 (alteration in original) (quoting Webb v. Mercy Hop., 102 F.3d 958, 959-60 (8th Cir. 1996)).  The burden then shifts to the City to proffer a legitimate, nondiscriminatory reason for the adverse employment action.  See id.  Once the City proffers such a reason, the burden shifts back to Kincaid to show that the City's stated reason is pretextual.  See id.

For purposes of this appeal, we assume without deciding that Kincaid established a prima facie case of disability discrimination. Our analysis focuses, instead, on whether Kincaid presented sufficient evidence to rebut the City's legitimate, nondiscriminatory reasons for its employment actions. We find that Kincaid failed to meet her burden.

Carey and Hauptman asserted that Kincaid was not considered for the Detention Manager position in July 2000 or January 2001 because she was out on leave at those times and had not presented a doctor's release to indicate that she was able to return to work. The City claimed that standard operating procedures required an injured employee to present a doctor's release, or "fitness for duty certificate," prior to reinstatement. The City's assertion and Carey and Hauptman's testimony is supported by the following written evidence in the record: the City's Administrative Manual, Riley's letter to Dr. Hansen inquiring about Kincaid's ability to return to work and the City's willingness to accommodate any necessary restrictions, and Murphy's letter advising Kincaid that she must present a "fitness for duty certificate" prior to returning to work.

Kincaid offered no evidence to rebut the City's assertion that its standard operating procedures required injured employees to present a doctor's release prior to reinstatement, nor did she offer evidence showing that the City applied this policy more stringently to her than to other injured employees.[3] There is no dispute that

---

[3]At oral argument, Kincaid's counsel argued that the City did not have a policy requiring injured employees to submit a doctor's release prior to reinstatement. Upon further questioning from the Court regarding the City's standard operating procedures and the letter in which Murphy advised Kincaid that she must present a "fitness for duty certificate" prior to resuming employment, Kincaid's counsel argued that the City required doctor's releases only from employees who wished to be reinstated to positions involving physical confrontations with prisoners. We find this argument wholly unsupported by the record.

Kincaid failed to present a doctor's release to the City before it hired Larson. Indeed, the record indicates that Dr. Hansen did not approve Kincaid to perform any work until September 12, 2000—more than two months after the City hired Larson. Based on these facts, no reasonable jury could find that the City's selection of Larson over Kincaid was motivated by discriminatory animus. The question remaining is whether Kincaid presented sufficient evidence to rebut the City's nondiscriminatory reasons for selecting Benak.

The parties dispute when the City hired Benak. Kincaid claims that while she was working during the two-week period between her injuries in September 2000, Captain Infantino informed her and other employees that Benak received the Detention Manager position. The City, on the other hand, claims it hired Benak after Kincaid re-injured herself and went on leave the second time. Even assuming the City made the decision to hire Benak in September 2000 when Kincaid was able to work, we find that Kincaid failed to meet her burden under the third prong of the McDonnell Douglas analysis.

Kincaid argues that the City's discriminatory animus is evinced by the fact that the City hired someone less qualified than her for the Detention Manager position. Although an employer's selection of a less qualified candidate "can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual," it is the employer's role to "[i]dentify[] those strengths that constitute the best qualified applicant." Duffy v. Wolle, 123 F.3d 1026, 1037-38 (8th Cir. 1997). This is so because "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).

In this case, the City claimed that Benak, a retired police lieutenant, had a unique set of skills that would facilitate the merger of the City and county jails and allow him to manage the jail effectively. The City presented evidence that Benak had a thorough knowledge of police operations, experience with budgets and mergers, and an ability to work with City and county officials. Kincaid did not dispute Benak's abilities, nor did she dispute the fact that the City and county jails were being merged. Instead, Kincaid maintained that she was more qualified than Benak because of her experience as a Detention Supervisor and the fact that she had occasionally filled in as the Detention Manager on previous occasions.

Viewed in the light most favorable to Kincaid, the record showed that Kincaid and Benak were both qualified for the Detention Manager position. However, to support a finding of pretext, Kincaid must show that the City hired a *less* qualified applicant. Duffy, 123 F.3d at 1037; cf. Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1311 (8th Cir. 1995) ("Although [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual."); Pierce v. Marsh, 859 F.2d 601, 604 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants, one black male and one white female, alone does not raise an inference of racial discrimination."). Based on the record, no reasonable jury could find that Benak was less qualified than Kincaid.

In sum, the record shows that Kincaid was not available to work at the jail when the City hired Larson and that Benak and Kincaid's qualifications were, at most, comparable. Because Kincaid offered insufficient evidence to rebut the legitimate reasons the City offered for its employment decisions, we affirm the district court's grant of summary judgment in favor of the City on Kincaid's ADA claim.

C.    Race Discrimination

We also analyze Kincaid's racial discrimination claims under the McDonnell Douglas burden-shifting framework.  Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1997) (stating that the McDonnell Douglas analysis applies to Title VII disparate treatment and § 1981 claims).  Kincaid offered the same evidence of pretext in support of her racial discrimination claims as she did with respect to her ADA claim.  As discussed above, this evidence is insufficient to rebut the legitimate, nondiscriminatory reasons put forth by the City.  We therefore affirm the district court's grant of summary judgment in favor of the City on the racial discrimination claims.

Based on the foregoing, we affirm the judgment of the district court.

_____